IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MITZIE PEREZ, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO & CO. and WELLS FARGO BANK, N.A.,<br><br>Defendants. | Case No. 17-cv-00454-MMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS; AFFORDING PLAINTIFFS LEAVE TO AMEND; CONTINUING CASE MANAGEMENT CONFERENCE**<br><br>Re: Dkt. No. 43 |

Before the Court is defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") motion, filed June 16, 2017, to dismiss plaintiffs' First Amended Complaint ("FAC").[1] Plaintiffs Mitzie Perez ("Perez"), Andres Acosta ("Acosta"), Sergio Barajas ("Barajas"), Teresa Diaz Vedoy ("Diaz Vedoy"), Victoria Rodas ("Rodas"), Samuel Tabares Villafuerte ("Tabares Villafuerte"), and California League of United Latin American Citizens ("LULAC") have filed opposition, to which Wells Fargo has replied. Having read and considered the parties' respective written submissions, the Court rules as follows.[2]

**BACKGROUND**

Plaintiffs allege that each of the individual plaintiffs is "not a citizen of the United States" (see FAC ¶ 81) and has "authorization to work in the U.S. under Deferred Action for Childhood Arrivals" (see FAC ¶¶ 4, 6, 8, 10, 12, 14). The remaining plaintiff is alleged to be a "civil rights organization" that has as one of its "primary functions and purposes"

---

[1] By notice filed May 3, 2017, plaintiffs voluntarily dismissed the FAC to the extent it was alleged against defendant Wells Fargo & Co.

[2] By order filed June 13, 2017, the Court took the matter under submission.

the "improvement and advancement of educational opportunities for persons of Latino and Mexican-American descent or nationality." (See FAC ¶ 15.)

Plaintiffs allege each individual plaintiff applied for credit from Wells Fargo and that Wells Fargo denied each application because the applicant did not meet "Wells Fargo's citizenship status requirements" (see FAC ¶¶ 72, 79), under which requirements, plaintiffs allege, an applicant must be either a citizen of the United States (see FAC ¶ 80) or a permanent resident who has a cosigner who is a citizen (see FAC ¶¶ 40, 63-67, 80).

Specifically, according to plaintiffs, (1) Perez applied for a "student loan," which Wells Fargo denied "due to her citizenship status" (see FAC ¶¶ 39, 40), (2) Acosta applied for a "commercial equipment loan," which, "because he was neither a U.S. citizen nor a permanent resident," Wells Fargo denied and, additionally, "cancelled" a "credit card" it previously had issued to him (see FAC ¶¶ 43, 45-48), (3) Sergio Barajas applied for a "credit card," which Wells Fargo denied because he "did not have a green card" (see FAC ¶¶ 43, 46), (4) Diaz Vedoy applied for a "personal loan and a credit card," both of which Wells Fargo denied because she was "not a permanent United States resident" (see FAC ¶¶ 58, 60), (5) Rodas applied for a "student loan," which Wells Fargo denied because she was "not a permanent resident" (see FAC ¶¶ 64, 67), and (6) Tabares Villafuerte applied for a "student credit card," which Wells Fargo denied because he was "not a permanent resident" (see FAC ¶¶ 69, 71).

Based on the above allegations, plaintiffs, on their own behalf and on behalf of a putative class, assert three Claims for Relief, specifically, a claim under 42 U.S.C. § 1981, a claim under the California Unruh Civil Rights Act, and a claim under the California Unfair Competition Law.

**DISCUSSION**

Wells Fargo seeks dismissal of all claims alleged in the FAC.

**A. Federal Claim: 42 U.S.C. § 1981**

In the First Claim for Relief, plaintiffs allege that Wells Fargo's denials of the individual plaintiffs' applications for credit violated 42 U.S.C. § 1981, which provides, in

2

relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." See 42 U.S.C. § 1981(a). Section 1981 "protect[s] primarily against racial discrimination" but also "protects against discrimination on the basis of alienage." See Sagana v. Tenorio, 384 F.3d 731, 738 (9th Cir. 2004) (holding "[j]ust as the word 'white' indicates that § 1981 bars discrimination on the basis of race, the word 'citizen' attests that a person cannot face disadvantage in the activities protected by § 1981 solely because of his or her alien status").[3]

At the outset, the Court notes that plaintiffs do not suggest, and the Court does not find, that a creditor cannot consider whatever factors may be relevant in assessing an individual's creditworthiness. Nor do plaintiffs allege that Wells Fargo categorically denies all credit applications submitted by aliens. Plaintiffs acknowledge that Wells Fargo does accept credit applications from permanent residents who have citizen cosigners (see FAC ¶¶ 40, 63), and the Court understands plaintiffs to be alleging that Wells Fargo violated § 1981 by not allowing plaintiffs to submit an application even where such plaintiff has a citizen cosigner (see FAC ¶ 40 (alleging that "had [plaintiff] Perez been allowed to apply for a loan, she would have had a cosigner available to meet Wells Fargo's cosigner requirement"); FAC ¶¶ 63, 65, 67 (alleging plaintiff Rodas's application was denied although a citizen cosigner had "submitted paperwork by mail in connection with [her] application")).

Wells Fargo argues that plaintiffs' § 1981 claim is subject to dismissal in light of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691. The ECOA provides that it is "unlawful for any creditor to discriminate against any applicant, with respect to any aspect

---

[3]Although, as Wells Fargo correctly observes, Sagana found § 1981 prohibits "governmental discrimination on the basis of alienage," see id. at 739, "[t]he rights protected by [§ 1981] are [also] protected against impairment by nongovernmental discrimination," see 42 U.S.C. § 1981(c); Anderson v. Conboy, 156 F.3d 167, 176 (2nd Cir. 1998) (holding "the rights enumerated in § 1981(a) are protected from private as well as governmental discrimination").

3

of a credit transaction," see 15 U.S.C. § 1691(a), where such discrimination is "on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)," see 15 U.S.C. § 1691(a)(1), or "because all or part of the applicant's income derives from any public assistance program," see 15 U.S.C. § 1691(a)(2), or "the applicant has in good faith exercised any right under [the ECOA]," see 15 U.S.C. § 1691(a)(3). As Wells Fargo observes, "alienage is not within the purview of the [ECOA]." See Nguyen v. Montgomery Ward & Co., 513 F. Supp. 1039, 1040 (N.D. Texas 1981).[4]

Citing, inter alia, RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012), Wells Fargo argues that "[w]hen statutes overlap or conflict, the more specific statute must control and the claims under the general statute should be dismissed." (See Def.'s Mot. at 10:24-25; 11:16-17.)

As the Supreme Court observed in RadLAX, however, the "general/specific canon is not an absolute rule," but, rather, one of statutory construction. See RadLAX Gateway Hotel, 566 U.S. at 646 (noting, where general and specific provisions appear in same statute, canon is "strong indication of statutory meaning"). In that regard, "[i]t is, of course, a cardinal principle of statutory construction that repeals by implication are not favored." See Radzanower v. Touche Ross & Co., 426 U.S. 148, 154 (1976) (internal quotation and citation omitted). Indeed, as the Supreme Court has explained:

> When there are two acts upon the same subject, the rule is to give effect to both if possible. The intention of the legislature to repeal must be clear and manifest. It is not sufficient . . . to establish that subsequent laws cover some or even all of the cases provided for by the prior act; for they may be merely affirmative, or cumulative, or auxiliary. There must be a positive

---

[4] The only reference to alienage appears in two regulations promulgated under the ECOA. Neither, however, states a creditor is free to decline credit to an applicant solely on the basis of alienage. See 12 C.F.R. § 202.5(e) (providing "creditor may inquire about the permanent residency and immigration status of an applicant or any other person in connection with a credit transaction") (emphasis added); 12 C.F.R. § 202.6(b)(7) (providing "creditor may consider the applicant's immigration status or status as a permanent resident of the United States, and any additional information that may be necessary to ascertain the creditor's rights and remedies regarding repayment") (emphasis added).

4

repugnancy between the provisions of the new law and those of the old; and even then the old law is repealed by implication only, pro tanto, to the extent of the repugnancy.

See United States v. Borden Co., 308 U.S. 188, 198-99 (1939) (internal quotations, citation and alteration omitted).

Here, there is no dispute that § 1981 is the general statute, in that it prohibits discrimination in the making of any type of contract, while the ECOA prohibits discrimination in the making of a specific type of contract, namely, a contract for credit. As set forth above, however, the Court is obligated to "give effect to both if possible." See id. at 198. In that regard, the Court finds the two statutes can be read to give effect to both, in that § 1981 precludes a creditor from discriminating on the basis of race or alienage, whereas the ECOA precludes a creditor from discriminating on additional grounds, such as religion and national origin.[5] As noted in Borden, the fact that the later-enacted statute "cover[s] some . . . of the cases provided for by the prior act" is "not sufficient" to establish Congress intended to repeal the prior statute. See Borden, 308 U.S. at 198 (internal quotation, citation and alteration omitted). A creditor can comply with § 1981 and the ECOA by not discriminating on the basis of any of the categories listed in the two statutes.

Wells Fargo seeks to avoid the proscriptions of § 1981 by relying on the absence of protections for aliens under the ECOA. "It is not enough," however, "to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem." Radzanower, 426 U.S. at 155. Rather, there must be "a positive repugnancy between them" or, put another way, that "they cannot mutually co-exist." See id.

For example, Congress has enacted statutes that have "barred aliens from federal

---

[5]Moreover, the ECOA provides to a plaintiff covered thereunder an additional basis for relief. In particular, while liability under § 1981 requires a finding of intentional discrimination, see General Building Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 382-91 (1982), liability under the ECOA can be established by a showing of disparate impact, see Miller v. American Express Co., 688 F.2d 1235, 1239-40 (9th Cir. 1982).

5

employment," see Espinoza v. Farah Manufacturing Co., 414 U.S. 86, 90 (1973) (noting 1973 appropriations act precluded use of federal funds to pay any federal employee who was not "a citizen of the United States"), as well as a statute that prohibits all employers from hiring "an alien knowing the alien is an unauthorized alien," see 8 U.S.C. § 1324a. In those instances, it is readily apparent that § 1981 would, by implication and "to the extent of the repugnancy," be repealed by the specific statutes. See Borden, 308 U.S. at 198-99. By contrast, § 1981 and the ECOA are, as discussed above, capable of co-existence.

The Court next considers whether the legislative history nonetheless indicates that Congress, by enacting the ECOA, intended to repeal by implication § 1981 insofar as § 1981 would apply to credit transactions. See, e.g., Brown v. General Services Admin., 425 U.S. 820, 821, 833-34 (1976) (looking to legislative history of Title VII to determine its effect on claims brought under § 1981).

Section 1981, as initially enacted in 1866, provided that "citizens of every race and color" had the "same right . . . to make and enforce contracts" as was "enjoyed by white citizens," see McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 291 n.21 (1976), thus "bar[ring] discrimination on the basis of race," see Sagana, 384 F.3d at 738. In 1870, Congress amended § 1981 to replace the phrase "citizens of every race and color" with "all persons within the jurisdiction of the United States," the purpose being to increase the scope of § 1981 to "protect[ ] against discrimination on the basis of alienage," see id. at 737-38, and, in particular, "to alleviate the plight of Chinese immigrants in California," see Anderson, 156 F.3d at 173.

The ECOA, as initially enacted in 1974, prohibited credit discrimination on the basis of "sex or marital status," see Brothers v. First Leasing, 724 F.2d 789, 791 (9th Cir. 1984), the "purpose" being "to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit," see id. at 793-94 (internal quotation and citation omitted). In 1976, Congress amended the ECOA to "reaffirm[ ] the goal of antidiscrimination in credit . . . by adding

race, color, religion, national origin, and age to sex and marital status," see id. at 794, as well as persons whose income derives from public assistance or who have exercised a statutory right, see Equal Credit Opportunity Act Amendments of 1976, Pub. L. No. 94-239, § 2, 90 Stat. 251 (1976), thereby creating "one more tool to be used in our vigorous national effort to eradicate invidious discrimination root and branch from our society," see Brothers, 724 F.2d at 794 (citing, inter alia, Senate report). Under such circumstances, the Court is not persuaded that Congress, by enacting the ECOA, intended to withdraw from aliens the protections provided by § 1981.

Accordingly, the Court finds the First Claim for Relief is not subject to dismissal.

**B. State Law Claims**

As noted, plaintiffs allege two claims arising under state law.

**1. Unruh Act**

In the Second Claim for Relief, plaintiffs allege that Wells Fargo's denials of the individual plaintiffs' applications for credit violated the Unruh Act, which provides that "[n]o business establishment of any kind whatsoever shall discriminate . . . on account of any characteristic listed or defined in subdivision (b) . . . of Section 51 [of the California Civil Code]." See Cal. Civ. Code § 51.5(a). Section 51(b), in turn, provides in relevant part that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their . . . immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." See Cal. Civ. Code § 51(b).

Wells Fargo first argues the Unruh Act claim is subject to dismissal pursuant to § 51(c), which, in relevant part, provides that the Unruh Act "shall not be construed to confer any right or privilege on a person that is conditioned or limited by law." See Cal. Civ. § 51(c). Under § 51(c), "if there is a conflict between [the Unruh Act's] provisions and those of another statute, the former defers to the latter." See Lazar v. Hertz Corp., 69 Cal. App. 4th 1494, 1504-05 (1999). Wells Fargo argues that the "general provisions of the Unruh Act" conflict with the "specific provisions of the ECOA." (See Def.'s Reply at

7

13:25-27.)  As discussed above with respect to the First Claim for Relief, the Court finds Congress, by enacting the ECOA, did not intend to authorize creditors to discriminate on the basis of alienage or otherwise to remove protections against discrimination afforded under other statutes.

Wells Fargo next argues the Unruh Act claim is subject to dismissal in light of the California Supreme Court's decision in Harris v. Capital Growth Investors XIV, 52 Cal. 3d 1142 (1991).  In Harris, the Supreme Court set forth an analytical framework for the purpose of determining when a plaintiff may base an Unruh Act claim on a classification not expressly enumerated in the act.  See Harris, 52 Cal. 3d at 1155 (citing prior cases in which courts had found Unruh Act "appl[ied] to several classifications not expressed in the statute"); Koebke v. Bernardo Heights Country Club, 36 Cal. 4th 824, 840 (2005) (explaining Harris created "analytical framework" for determining when claims based on non-enumerated categories are "cognizable").  In particular, a plaintiff alleging such a claim must establish the classification is "based on a personal characteristic similar to those listed in the statute"; where the requisite showing is made, the trial court next considers "whether the alleged discrimination was justified by a legitimate business reason" and "the consequences of allowing the claim to proceed."  See Semler v. General Elec. Capital Corp., 196 Cal. App. 4th 1380, 1392-93 (2011) (citing Harris, 52 Cal. 3d at 1159-62, 1167)).

In reliance on Harris, Wells Fargo argues the Court should determine at the pleading stage whether plaintiffs' Unruh Act claim is viable under the framework set forth in Harris, i.e., whether Wells Fargo's alleged differential treatment is justified by legitimate business reasons and whether allowing the claim to proceed would have negative consequences.  The framework described in Harris, however, is used to assess the viability of an Unruh Act claim "involving a category not enumerated in the statute or added by prior judicial construction."  See Koebke, 36 Cal. 4th at 840.  Harris provides a method of "statutory interpretation" to be used to determine whether the Legislature intended the Unruh Act to apply to a particular unenumerated category.  See Harris, 52

8

Cal. 3d at 1159 (addressing whether Legislature intended Unruh Act to encompass "additional classification of 'economic discrimination'"); Koebke, 36 Cal. 4th at 836-37 (observing Harris concluded Unruh Act "did not include within its ambit claims of economic status discrimination because economic status is fundamentally different than the categories either enumerated in the Act or added by judicial construction"). Here, plaintiffs base their Unruh Act claim on an enumerated category, specifically, "immigration status." (See FAC ¶ 103.) As the California Legislature has expressly determined that claims alleging discrimination on the basis of immigration status are cognizable under the Unruh Act, the question of statutory interpretation addressed in Harris is not presented here.[6]

An Unruh Act claim based on an enumerated category, however, fails "where public policy warrants [the challenged] differential treatment" or where "a compelling social policy support[s]" the challenged differential treatment. See Koire v. Metro Car Wash, 40 Cal. 3d 24, 38 (1985) (noting, "[f]or example, some sex-segregated facilities, such as public restrooms, may be justified by the constitutional right to personal privacy"). In that regard, Wells Fargo argues, "[t]here exist concerns about repayment of an obligation when the individual on the other end of the transaction cannot guarantee that they will continue to be in the country or be able to be contacted years into the future, when a loan or credit card may require payment." (See Def.'s Mot. at 17:20-22.)

The Court recognizes the existence of a social policy favoring a stable economy, and that requiring creditors to extend credit to individuals under circumstances where creditors have little or no realistic ability to collect unpaid debts would undermine such

---

[6]Wells Fargo argues that the Court of Appeal, in Howe v. Bank of America N.A., 179 Cal. App. 4th 1443 (2009), applied the Harris framework to an Unruh Act claim that alleged discrimination on the basis of an enumerated category. Wells Fargo's reliance on Howe is misplaced. Although the Court of Appeal in Howe did apply the Harris framework, it did so after concluding the plaintiffs, although purporting to base their Unruh Act claim on the enumerated classification of national origin, in fact were alleging discrimination on the basis of "citizenship," which, at that time, was not an enumerated category. See Howe, 179 Cal. App. 4th at 1450 n.2.

policy. As discussed above, however, the policy challenged by plaintiffs is Wells Fargo's alleged categorical ban on considering any credit application submitted by an alien non-permanent resident even where the applicant has a citizen cosigner, and, as noted, plaintiffs do not suggest a creditor cannot consider whatever factors may be relevant in assessing an individual's creditworthiness. At this stage of the proceedings, the record before the Court is insufficient to support a finding, as a matter of law, that public policy considerations warrant a creditor's distinguishing between a permanent resident who has a citizen cosigner and a non-permanent resident who has a citizen cosigner. Indeed, it would appear that, in either situation, the citizen co-signer could be held responsible for any non-payment by the alien. To the extent there may exist public policy considerations nonetheless warranting such distinction in spite of the Unruh Act's express inclusion of immigration status, such considerations are not apparent from the face of the FAC.

Wells Fargo also argues that plaintiffs have "failed to plead intentional discrimination, as required to state a claim under the Unruh Act." (See Def.'s Reply at 12:14-15.) The FAC, however, alleges that Wells Fargo advised the individual plaintiffs that their applications for credit were denied on the ground they were not permanent residents. (See FAC ¶¶ 40, 46, 55, 60, 67, 71.) To the extent Wells Fargo contends its decisions were based on considerations other than the alleged categorical exclusion, any such determination cannot be made on the face of the FAC.

Lastly, Wells Fargo argues that, to the extent the Unruh Act is brought on behalf of plaintiff Acosta, the claim is subject to dismissal because the FAC alleges Acosta resides in Texas (see FAC ¶ 5), and that he applied for and was denied credit in Texas (see FAC ¶¶ 43, 49). As the Unruh Act's protections extend only to "persons within the jurisdiction of this state," see Cal. Civ. Code § 51(b), and plaintiffs allege no facts to indicate Acosta is or has been such a person, the Court agrees. See Archibald v. Cinerama Hawaiian Hotels, Inc., 73 Cal. App. 3d 152, 159 (1977) (holding Unruh Act "by its express language applies only within California").

Accordingly, the Second Claim for Relief, other than to the extent alleged on

behalf of Acosta, is not subject to dismissal.

**2. Unfair Competition Law**

In the Third Claim for Relief, plaintiffs allege that Wells Fargo's denials of the individual plaintiffs' respective applications for credit violated California's Unfair Competition Law, as set forth in §§ 17200-17210 of the Business & Professions Code, which prohibits "any unlawful, unfair or fraudulent business act or practice." See Cal. Bus. & Prof. Code § 17200.

At the outset, Wells Fargo argues that the § 17200 claim, which is derivative of plaintiffs' § 1981 and Unruh Act claims (see FAC ¶¶ 108, 111-12), is subject to dismissal for failure to allege an underlying unlawful act. As discussed above, however, the First and Second Claims are, with limited exception, not subject to dismissal.

Wells Fargo next argues that the § 17200 claim, to the extent it is alleged on behalf of Rodas, Tabares Villafuerte, Perez, Diaz Vedoy and Acosta, is subject to dismissal for lack of statutory standing.[7] As set forth below, the Court agrees.

Under California law, a plaintiff may bring a claim under § 17200 only if he/she "has suffered injury in fact and has lost money or property as a result of the unfair competition." See Cal. Bus. & Prof. Code § 17204. Here, as Wells Fargo points out, the FAC includes no facts to support a finding that any of the above-referenced five plaintiffs lost money or property as the result of the credit denials.

First, as to Rodas and Tabares Villafuerte, plaintiffs fail to allege, even in conclusory fashion, that either of those two plaintiffs lost money or property as a result of the credit denials.

As to Perez and Diaz Vedoy, although the FAC contains an allegation that said plaintiffs used "various credit cards" to pay for, respectively, "tuition" (see FAC ¶ 41) and "college-related expenses" (see FAC ¶ 61), plaintiffs fail to allege that the interest rates

---

[7]Wells Fargo does not make this argument as to plaintiffs Barajas and LULAC. (See Def.'s Mot. at 24:1-8.)

11

1  and fees charged by the credit card providers were in excess of the rates and fees those
2  plaintiffs would have paid Wells Fargo had it approved their applications for student
3  loans.

Similarly, although plaintiffs allege that, after Wells Fargo cancelled Acosta's credit card, he "was forced to pay off the outstanding credit card balance using money he was saving to purchase a home" (see FAC ¶ 49), plaintiffs fail to allege that in repaying the obligation at the time and in the manner he did, Acosta paid more than he would have paid had his credit card remained operative. Additionally, as Wells Fargo notes, Acosta is alleged to reside in Texas and to have interacted with Wells Fargo in Texas. Section 17200 "was not intended to regulate conduct unconnected to California," see Norwest Mortgage, Inc. v. Superior Court, 72 Cal. App. 4th 214, 222 (1999), and the FAC includes no facts to support a finding that Wells Fargo's decision to deny Acosta credit was in any manner connected to California.

Accordingly, to the extent the Third Claim for Relief is alleged on behalf of Rodas, Tabares Villafuerte, Perez, Diaz Vedoy and Acosta, such claim is subject to dismissal.

## CONCLUSION

For the reasons stated above, Wells Fargo's motion to dismiss the First Amended Complaint is hereby GRANTED in part and DENIED in part as follows:

1. To the extent the Second Claim for Relief is alleged on behalf of Acosta, the motion is GRANTED.

2. To the extent the Third Claim for Relief is alleged on behalf of Rodas, Tabares Villafuerte, Perez, Diaz Vedoy and Acosta, the motion is GRANTED.

3. In all other respects, the motion is DENIED.

4. If plaintiffs wish to file a Second Amended Complaint for the purpose of curing any or all of the above-described deficiencies, plaintiffs shall file their Second Amended Complaint no later than August 18, 2017. Plaintiffs may not, however, add new claims for relief or new parties without first obtaining leave of court. See Fed. R. Civ. P. 15(a)(2). If plaintiffs do not file a Second Amended Complaint by the date specified, the instant

12

action will proceed on the remaining claims in the FAC.

5. In light of the above, the Case Management Conference is hereby CONTINUED from August 25, 2017, to September 18, 2017, at 10:30 a.m. A Joint Case Management Statement shall be filed no later than September 11, 2017.

**IT IS SO ORDERED.**

Dated: August 3, 2017

MAXINE M. CHESNEY
United States District Judge