Jahan C. Sagafi (Cal. Bar No. 224887)
Rachel Dempsey (Cal. Bar No. 310424)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
jsagafi@outtengolden.com
rdempsey@outtengolden.com

Ossai Miazad*
Michael N. Litrownik*
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
om@outtengolden.com
mlitrownik@outtengolden.com

Daniel S. Stromberg*
Hannah Cole-Chu*
OUTTEN & GOLDEN LLP
601 Massachusetts Avenue, 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile: (202) 847-4410
dstromberg@outtengolden.com
hcolechu@outtengolden.com

Thomas A. Saenz (Cal. Bar No. 159430)
Belinda Escobosa Helzer (Cal. Bar
No. 214178)
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND
634 S. Spring St., 11th Floor
Los Angeles, CA 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266
tsaenz@maldef.org
bescobosa@maldef.org

*Attorneys for Plaintiffs and the Proposed Class*
*Additional counsel listed on signature page*
*admitted *pro hac vice*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MITZIE PEREZ and SERGIO BARAJAS, individually, and ANDRES ACOSTA, TERESA DIAZ VEDOY, VICTORIA RODAS, and SAMUEL TABARES VILLAFUERTE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | Case No. 17-cv-00454-MMC<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY SETTLEMENT APPROVAL ORDER**<br><br>Judge:      Maxine M. Chesney<br>Hearing Date:  July 10, 2020<br>Hearing Time:  9:00 a.m.<br>Courtroom:   7, 19th floor |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on July 10, 2020, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 7 on the 19th floor of this Court's San Francisco Courthouse, located at 450 Golden Gate Avenue in San Francisco, California, Plaintiffs Mitzie Perez and Sergio Barajas, individually, and Plaintiffs Victoria Rodas, Samuel Tabares Villafuerte, Teresa Diaz Vedoy, and Andres Acosta, individually and as class representatives on behalf of the Class, will, and hereby do, move this Court for the following relief with respect to the Settlement Agreement and Release (attached as Exhibit A to the Declaration of Ossai Miazad in Support of Motion for Preliminary Settlement Approval Order) with Defendant Wells Fargo Bank, N.A.:

1. that the Court certify, for settlement purposes only, settlement classes pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3);

2. that the Court appoint Plaintiffs Rodas, Villafuerte, Vedoy, and Acosta as representatives of the Class;

3. that the Court appoint Plaintiffs' attorneys as Class Counsel;

4. that the Court grant preliminary approval of the Settlement;

5. that the Court approve mailing to the Class Members the proposed Class Notice;

6. that the Court appoint JND Legal Administration Co. as the Settlement Administrator; and

7. that the Court schedule a hearing for final approval of the Settlement.

This Motion is made on the grounds that the Settlement is the product of arms-length, good-faith negotiations; is fair, reasonable, and adequate to the Class; and should be preliminarily approved, as discussed in the attached memorandum.

The Motion is based on: this notice; the following memorandum in support of the motion, the Miazad declaration and attached Settlement Agreement, the Helzer declaration, the Court's record of this action; all matters of which the Court may take notice; and oral and documentary evidence presented at the hearing on the motion.  This motion is unopposed by Wells Fargo.

MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT
CASE NO. 17-cv-00454-MMC

1   Dated: June 16, 2020                    Respectfully submitted,

2                                           By:  /s/ *Ossai Miazad*
3                                                Ossai Miazad

4                                           Ossai Miazad*
                                            Michael N. Litrownik*
5                                           OUTTEN & GOLDEN LLP
                                            685 Third Avenue, 25th Floor
6                                           New York, NY 10017
                                            Telephone: (212) 245-1000
7                                           Facsimile:  (646) 509-2060
8                                           om@outtengolden.com
                                            mlitrownik@outtengolden.com
9                                           estork@outtengolden.com

10                                          Daniel S. Stromberg*
                                            Hannah Cole-Chu*
11                                          OUTTEN & GOLDEN LLP
12                                          601 Massachusetts Avenue, 200W
                                            Washington, D.C. 20001
13                                          Telephone: (202) 847-4400
                                            Facsimile:  (202) 847-4410
14                                          dstromberg@outtengolden.com
15                                          hcolechu@outtengolden.com

16                                          Jahan C. Sagafi (Cal. Bar No. 224887)
                                            Rachel Dempsey (Cal. Bar No. 310424)
17                                          OUTTEN & GOLDEN LLP
18                                          One California St., 12th Floor
                                            San Francisco, California 94111
19                                          Telephone: (415) 638-8800
                                            Facsimile:  (415) 638-8810
20                                          jsagafi@outtengolden.com
                                            rsun@outtengolden.com
21                                          rdempsey@outtengolden.com

22                                          Thomas A. Saenz (Cal. Bar No. 159430)
23                                          Belinda Escobosa Helzer (Cal. Bar
                                            No. 214178)
24                                          MEXICAN AMERICAN LEGAL DEFENSE
                                            AND EDUCATIONAL FUND
25                                          634 S. Spring St., 11th Floor
                                            Los Angeles, CA 90014
26                                          Telephone: (213) 629-2512
27                                          Facsimile:  (213) 629-0266
                                            tsaenz@maldef.org
28                                          bescobosa@maldef.org

MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT
CASE NO. 17-cv-00454-MMC

Tanya Gabrielle Pellegrini (Cal. Bar No. 285186)
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
1512 14th Street
Sacramento, CA 95814
Telephone: (916) 444-3031
tpellegrini@maldef.org

*admitted *pro hac vice*

*Attorneys for Plaintiffs and the Proposed Class*

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ........................................... 2

    A.  Wells Fargo's Lending Policies Made DACA Recipients Ineligible for
        Credit ...................................................................................................... 2

    B.  Procedural History .................................................................................. 3

III.  THE PROPOSED SETTLEMENT ..................................................................... 6

    A.  The Settlement Classes ............................................................................ 6

    B.  Settlement Overview ................................................................................ 7

        1.  Programmatic Relief ...................................................................... 7

        2.  Monetary Relief ............................................................................. 7

    C.  Class Representative and Individual Plaintiff Service Awards ............................. 11

    D.  Attorneys' Fees and Costs ..................................................................... 12

    E.  Settlement Administration Costs ............................................................ 13

    F.  Cy Pres Awardees .................................................................................. 14

IV.  ARGUMENT ..................................................................................................... 14

    A.  Certification of the Rule 23 Classes Is Proper ....................................... 15

        1.  Rule 23(a) Is Satisfied ................................................................ 15

        2.  Certification Is Proper Under Rule 23(b)(3) ............................... 17

        3.  Plaintiffs' Counsel Should Be Appointed as Class Counsel ...................... 18

    B.  The Settlement Is Fair, Reasonable, And Adequate ................................ 19

        1.  Plaintiffs' Case Faced Significant Hurdles on Liability and Class
            Certification ................................................................................. 19

        2.  The Settlement Amount Is Appropriate ....................................... 20

        3.  The Extent of Discovery Supports Settlement ............................ 22

        4.  Counsel's Experience and Views Support Approval .................. 23

        5.  The Parties Participated in Arms-Length Negotiations Before an
            Experienced Neutral Mediator ................................................... 23

    C.  The Proposed Notice Is Clear and Adequate ......................................... 24

V.    A FINAL APPROVAL HEARING SHOULD BE SCHEDULED ................................... 25

VI.   CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Abdullah v. U.S. Sec'y Assocs.*,
   731 F.3d 952 (9th Cir. 2013)..................................................................................... 15

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) .................................................................................... 16, 17, 18

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ............................................................................................ 17, 18

*Bayer v. Neiman Marcus Grp., Inc.*,
   861 F.3d 853 (9th Cir. 2017)..................................................................................... 21

*Betancourt v. Advantage Human Resourcing, Inc.*,
   No. 14 Civ. 01788, 2016 WL 344532 (N.D. Cal. Jan. 28, 2016) ......................... 19, 21

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011)..................................................................................... 12

*Buccellato v. AT&T Operations, Inc.*,
   No. 10 Civ. 00463, 2011 WL 3348055 (N.D. Cal. June 30, 2011)........................... 12

*Cancilla v. Ecolab, Inc.*,
   No. 12 Civ. 3001, 2015 WL 4760318 (N.D. Cal. Aug. 12, 2015) ............................ 19

*Civil Rights Educ. & Enf't Ctr. v. RLJ Lodging Tr.*,
   No. 15 Civ. 224, 2016 WL 314400 (N.D. Cal. Jan. 25, 2016)................................. 15

*Cotter v. Lyft, Inc.*,
   176 F. Supp. 3d 930 (N.D. Cal. 2016) ..................................................................... 20

*Covillo v. Specialtys Cafe*,
   No. 11 Civ. 00594, 2013 WL 5781574 (N.D. Cal. Oct. 25, 2013) ........................... 14

*Cunningham v. Cty. of Los Angeles*,
   879 F.2d 481 (9th Cir. 1988)..................................................................................... 12

*del Toro Lopez v. Uber Techs., Inc.*,
   No. 17 Civ. 6255, 2018 WL 5982506 (N.D. Cal. Nov. 14, 2018) ........................... 13

*Donnenfeld v. Petro, Inc.*,
   No. 17 Civ. 2310 (E.D.N.Y. Mar. 5, 2020), ECF No. 80-1 ...................................... 11

*In re Easysaver Rewards Litig.*,
   906 F.3d 747 (9th Cir. 2018)..................................................................................... 14

*Edwards v. Hearst Commc'ns,*
   No. 15 Civ. 9279 (S.D.N.Y. Apr. 4, 2019) ...........................................................11

*Ellis v. Costco Wholesale Corp.,*
   285 F.R.D. 492 (N.D. Cal. 2012) ........................................................................ 18

*Fernandez v. Victoria Secret Stores, LLC,*
   No. 06 Civ. 04149, 2008 WL 8150856 (C.D. Cal. July 21, 2008).........................23

*Fulford v. Logitech, Inc.,*
   No. 08 Civ. 204, 2010 WL 807448 (N.D. Cal. Mar. 5, 2010) ...............................12

*Galeener v. Source Refrigeration & HVAC, Inc.,*
   No. 13 Civ. 04960, 2015 WL 12976106 (N.D. Cal. Aug. 20, 2015) ......................11

*Glass v. UBS Fin. Servs., Inc.,*
   No. 06 Civ. 4068, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007)..............................12

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998)......................................................... 15, 16, 19

*In re Heritage Bond Litig.,*
   No. 02 ML 1475, 2005 WL 1594403 (C.D. Cal. June 10, 2005).............................21

*Johnson v. Triple Leaf Tea Inc.,*
   No. 14 Civ. 1570, 2015 WL 8943150 (N.D. Cal. Nov. 16, 2015) ..................... 13, 16

*Jones v. Wells Fargo Bank, N.A.,*
   No. B237282, 2015 WL 661757 (Cal. Ct. App. Feb. 17, 2015) ............................. 18

*Lewis v. Wells Fargo & Co.,*
   No. 08 Civ. 2670 (N.D. Cal. Apr. 29, 2011) ......................................................12

*Linney v. Cellular Alaska P'ship,*
   151 F.3d 1234 (9th Cir. 1998)...........................................................................22

*Ma v. Covidien Holding, Inc.,*
   No. 12 Civ. 2161, 2014 WL 360196 (C.D. Cal. Jan. 31, 2014).................................21

*In re Mego Fin. Corp. Sec. Litig.,*
   213 F.3d 454 (9th Cir. 2000)...........................................................................22

*In re MyFord Touch Consumer Litig.,*
   No. 13 Civ. 3072 (N.D. Cal. Nov. 7, 2019) ......................................................11

*Nat'l Rural Telecomm. Coop. v. DirecTV, Inc.,*
   221 F.R.D. 523 (C.D. Cal. 2004) .................................................................. 14, 23

*In re Painewebber Ltd. P'ships Litig.,*
   171 F.R.D. 104 (S.D.N.Y. 1997)......................................................................... 23

*Pappas v. Naked Juice Co of Glendora, Inc.*,
   No. 11 Civ. 8276, 2014 WL 12382279 (C.D. Cal. Jan. 2, 2014) .......................................... 13, 14

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ................................................................................................ 19, 23

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
   944 F.3d 1035 (9th Cir. 2019) ................................................................................................ 1,23

*Ross v. Trex Co.*,
   No. 09 Civ. 670, 2013 WL 12174133 (N.D. Cal. Dec. 16, 2013) ............................................... 12

*Ross v. U.S. Bank Nat'l Ass'n*,
   No. 07 Civ. 2951, 2010 WL 3833922 (N.D. Cal. Sept. 29, 2010) ............................................. 12

*Seguin v. Cty. of Tulare*,
   No. 16 Civ. 01262, 2018 WL 1919823 (E.D. Cal. Apr. 24, 2018) ............................................. 10

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
   904 F.2d 1301 (9th Cir. 1990) ................................................................................................... 14

*Stevens v. Harper*,
   213 F.R.D. 358 (E.D. Cal. 2002) ............................................................................................... 16

*Stovall-Gusman v. W.W. Granger, Inc.*,
   No. 13 Civ. 2540, 2015 WL 3776765 (N.D. Cal. June 17, 2015) ............................................. 21

*In re Tableware Antitrust Litig.*,
   484 F. Supp. 2d 1078 (N.D. Cal. 2007) ..................................................................................... 19

*Tierno v. Rite Aid Corp.*,
   No. 05 Civ. 02520, 2006 WL 2535056 (N.D. Cal. Aug. 31, 2006) ........................................... 18

*Tijero v. Aaron Bros., Inc.*,
   301 F.R.D. 314 (N.D. Cal. 2013) ............................................................................................... 23

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ............................................................................................................... 18

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................................................... 16

*Walsh v. CorePower Yoga LLC*,
   No. 16 Civ. 05610, 2017 WL 589199 (N.D. Cal. Feb. 14, 2017) ........................................ 17, 19

*Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*,
   No. 05 Civ. 2320, 2006 WL 2642528 (N.D. Cal. Sept. 14, 2006) ............................................ 18

*Wren v. RGIS Inventory Specialists*,
   No. 06 Civ. 05778, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) .............................................. 23

**Rules**

Fed. R. Civ. P. 23 ................................................................................................... *passim*

**Other Authorities**

Alba Conte & Herbert B. Newberg, 4 Newberg on Class Actions (4th ed. 2002).......................... 15

Alba Conte & Herbert B. Newberg, 4 Newberg on Class Actions (5th ed.)............................ 18, 19

Manual for Complex Litigation (4th ed. 2004) .............................................................. 14

## MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION

### I.   INTRODUCTION

Plaintiffs, five individuals who have lived in California and one who has lived in Texas since they were children, were each granted temporary protection from deportation, federal work authorization, and Social Security numbers under the June 2012 program known as Deferred Action for Childhood Arrivals ("DACA").  After obtaining DACA, work authorization, and SSNs, Plaintiffs applied to Wells Fargo for a variety of consumer and small business loans and credit cards.  Plaintiffs allege that Wells Fargo denied their applications for credit because they were not U.S. citizens or lawful permanent residents ("LPRs").  Plaintiffs then, in January 2017, brought a class action lawsuit against Wells Fargo, alleging lending discrimination based on alienage and immigration status.  The parties have now entered into a proposed settlement of this litigation for significant monetary and programmatic relief.  In connection with the settlement, Wells Fargo will change its lending policies to make credit and loans available to DACA recipients on the same terms and conditions as it offers credit to U.S. citizens, fully eliminating the harm challenged by the lawsuit.  The settlement also provides for monetary relief totaling $18.7 million, comprised of cash payments of at least $4,750,000 that could increase to as much as $13,100,000 to class members who submit valid claim forms, as well as $450,000 in administration costs, $150,000 in service awards for four class representatives and two individual plaintiffs, and $5,000,000 in fees and costs.  *See* Ex. A (Settlement Agreement or SA) §§ 3.3.1; 3.3.4; 3.37; 15.1; 15.2.[1]

For the reasons set forth below, the proposed Settlement and this Motion readily satisfy the requirements of Rule 23, Ninth Circuit precedent, *see, e.g.*, *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1060 (9th Cir. 2019), and established Northern District practice, including the Class Action Settlement Guidance.  *Procedural Guidance for Class Action Settlements*, U.S. Dist. Ct. for Northern District Cal., https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/ (last updated Dec. 5, 2018).  The parties have zealously litigated the

[1]    All exhibits are attached to the accompanying Declaration of Ossai Miazad in Support of Motion for Preliminary Settlement Approval Order ("Miazad Decl.")

complex class certification and liability issues presented by this case, briefing numerous motions to dismiss and strike, engaging in extensive fact and expert discovery, and participating in three in-person mediation sessions and dozens of phone conferences since June 2018, each supervised by Hunter R. Hughes, one of the leading national mediators of complex discrimination class actions.  Plaintiffs accordingly and respectfully submit that the Court should preliminary approve this exceptional settlement, and notice should issue to Class Members to let them make claims, object, or opt out, as appropriate.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Wells Fargo's Lending Policies Made DACA Recipients Ineligible for Credit.

DACA, announced by President Obama on June 15, 2012, and promulgated through the Department of Homeland Security, allows non-citizens who entered the United States as children and who meet certain requirements to apply for work authorization and relief from deportation proceedings.[2]  DACA was promulgated to provide opportunities to young people who came to the United States as children and "who want to staff our labs, or start new businesses, or defend our country."[3]  Its motivating principle was to strengthen its recipients' ability to actively participate in the American economy and contribute to civic life.[4]  In addition to work authorization, DACA recipients are eligible to apply for and receive SSNs, enabling them to identify themselves for employment and other contractual purposes.[5]

There is no federal or state law or regulation that prohibits banks from lending to non-citizens generally, or DACA recipients specifically, based on their status as non-citizens.  Wells Fargo, however, maintained lending policies that made DACA recipients facially ineligible for

---

[2]      Remarks on Immigration Reform and Exchange With Reporters, 2012 Daily Comp. Pres. Doc. 201200483 (June 15, 2012), https://www.govinfo.gov/content/pkg/DCPD-201200483/html/DCPD-201200483.htm.  *See generally* Memorandum from Janet Napolitano, Sec'y of Homeland Sec., on Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.
[3]      Obama, *supra* note 2.
[4]      *Id.*
[5]      Fact Sheet, Social Security Number and Card – Deferred Action for Childhood Arrivals, https://www.ssa.gov/pubs/deferred_action.pdf.

five different types of loans or credit under four different lines of business ("LOBs"): (1) unsecured student loans, offered by Educational Financial Services ("EFS"); (2) unsecured credit cards and (3) unsecured personal loans, offered by Consumer Financial Services ("CFS"); (4) both secured and unsecured small business loans and credit cards, offered by Business Direct (now called Small Business Lending); and (5) home mortgages, offered by Home Mortgage.

Plaintiffs are all DACA recipients living in the United States with valid SSNs who were denied the opportunity to be considered for credit from Wells Fargo, pursuant to the lending policies described above, because they were not U.S. citizens or LPRs (or, in the case of EFS, because they also did not have student visas). Plaintiffs Mitzie Perez and Sergio Barajas, residents of California (jointly, "Individual Plaintiffs"), bring claims individually. Plaintiffs Victoria Rodas, Samuel Tabares Villafuerte, and Teresa Diaz Vedoy, residents of California, and Andres Acosta, resident of Texas (jointly, "Class Representatives"), are proposed class representatives on behalf of one or more classes.

### B.  Procedural History

On January 30, 2017, Plaintiff Perez and the California League of United Latin American Citizens ("LULAC") filed a putative class action complaint against Wells Fargo Bank, N.A. and Wells Fargo & Co., with Plaintiff Perez seeking to represent all persons within the jurisdiction of the United States who were denied the right to contract for a loan or other financial product by Wells Fargo because they were not U.S. citizens. ECF No. 1. During this litigation, Plaintiffs amended their complaint four times, dismissed Wells Fargo & Co. as a defendant, added five additional individual plaintiffs, dismissed LULAC as a named plaintiff, briefed four motions to dismiss or strike, and narrowed their claims, including withdrawing a California Unfair Competition Law claim and narrowing their damages theories. ECF Nos. 37, 72, 155, 203, 267.

Plaintiffs filed their operative complaint in this action, the Fifth Amended Complaint ("5AC"), on July 15, 2019. ECF No. 267. In the 5AC, Plaintiffs Perez, Acosta, Barajas, Diaz Vedoy, Rodas, and Tabares Villafuerte assert claims of alienage discrimination under 42 U.S.C. § 1981 and immigration status and alienage discrimination under the California Unruh Civil Rights Act, Cal. Civil Code §§ 51 and 52 *et seq*. *Id.* ¶¶ 96-118. Plaintiffs sought to represent

three nationwide classes and two California sub-classes of non-U.S. citizens who resided in the United States and held DACA at the time they applied for certain credit products from Wells Fargo and were denied those products pursuant to certain internal Wells Fargo denial codes.  *Id.* ¶¶ 78-79.

The parties have engaged in extensive discovery since August 2017, including discovery of (a) emails and other electronic communications; (b) Wells Fargo's lending, underwriting, and credit risk policies, procedures, and processes; and (c) Plaintiffs' applications with Wells Fargo, credit reports and credit information, and applications with other banks.  Miazad Decl. ¶ 14.  The parties exchanged over five rounds of written discovery, including document requests, requests for admissions, and interrogatories, and raised 12 discovery disputes with Magistrate Judge Laporte.  *Id.* ¶ 13; *see also, e.g.*, ECF Nos. 247, 248, 279.  In total, Wells Fargo produced approximately 58,783 pages of documents and Plaintiffs produced approximately 10,179 pages of documents.  *Id.* ¶ 15.  Wells Fargo deposed all six Plaintiffs, and Plaintiffs deposed six fact and corporate witnesses.  *Id.* ¶ 16.  In addition, the parties reach retained three testifying experts—including consumer credit/finance and immigration law professors and practitioners—who prepared expert reports and sat for depositions.  *Id.* ¶ 17.  The parties conducted in-person mediation sessions with Mr. Hughes on June 19, 2018 and June 19, 2019 but were unable to make sufficient progress towards a resolution.  *Id*. ¶¶ 20-21.

In November 2019, Plaintiffs filed a Motion for Class Certification, seeking to certify the following classes: (i) all DACA residents during the covered period[6] who applied or will apply for a Wells Fargo student loan and were declined or will be declined under decline code "d01" ("EFS class"); (ii) all DACA residents who applied or will apply for an unsecured credit card and were declined under decline codes "1409" or "1614," or for an unsecured personal loan and were declined or will be declined under decline code "34N" or, between January 30, 2015 and February 13, 2015 only, decline code "321" ("CFS class"); and (iii) all DACA residents who applied for a small business credit card or loan and were declined or will be declined under

---

[6]     The covered period was defined as January 30, 2015 through the present.

decline codes "M93" or "Q14."  ECF No. 289.  The Motion for Class Certification also included two California sub-classes consisting of: (i) all EFS class members in California during the covered period; and (ii) all CFS class members in California during the covered period.  *Id.*  The decline codes are Wells Fargo's application database codes that generally reflect credit declines because the applicant is not a U.S. citizen or LPR:

| LOB | Product | Code | Reason |
|-----|---------|------|--------|
| EFS | Student loan | d01 | Applicant does not meet citizenship requirement. |
| CFS | Unsecured credit card | 1409 | Not a permanent United States resident. |
| CFS | Unsecured credit card | 1614 | Unable to verify permanency of residence. |
| CFS | Unsecured personal loan | 34N | Applicant is not a permanent United States resident. |
| CFS | Unsecured personal loan | 321 | We do not offer credit of this type or on the terms requested.[7] |
| BD | Small business loan or credit card | M93 | Product only available to businesses headquartered in the U.S., and owned by citizens or permanent residents. |
| BD | Small business loan or credit card | Q14 | Product only available to businesses headquartered in the U.S., and owned by and whose debt is guaranteed by citizens or permanent residents. |

In December 2019, the parties agreed to stay the case to participate in a third mediation before further briefing on Plaintiffs' Motion for Class Certification and the parties' Cross-Motions for Summary Judgment.  Miazad Decl. ¶ 22.  The parties mediated the case with Mr. Hughes in Atlanta, Georgia, for a third time, on January 29, 2020, during which they laid the groundwork for a settlement in principle.  *Id.* ¶ 23.  Over the next five weeks, the parties negotiated a term sheet, which they executed on March 4, 2020.  *Id.* ¶ 24.  The parties then spent over three months negotiating the terms of the complex Settlement Agreement, during which time Wells Fargo produced its home mortgage lending policy, which Plaintiffs believe is similar enough to student lending and personal lending to include in the Settlement.  *Id.* ¶¶ 25-27.  On June 16, 2020, the parties executed a long-form Settlement Agreement.  *Id.* ¶ 27.

---

[7]     This denial code is only used to identify class members between January 30, 2015 and February 13, 2015.  After February 13, 2015, class members are identified by the 34N denial code.  *See* ECF No. 247.

MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT
CASE NO. 17-cv-00454-MMC

III.     **THE PROPOSED SETTLEMENT**

A.     **The Settlement Classes**

For settlement purposes only and consistent with the parties' settlement agreement, Plaintiffs seek certification of the following classes, defined as:

**California Class** means all individuals who, between January 30, 2015 and the date of preliminary approval (or for home mortgage, between January 29, 2018 and the date of preliminary approval), held valid and unexpired DACA status, applied for credit from the Wells Fargo credit card, student lending, personal lines and loans, or home mortgage lines of business, were denied as set forth in the Class Data produced by Wells Fargo, and were California residents as set forth in the Class Data produced by Wells Fargo.  SA § 1.9.2.

**National Class** means all individuals who, between January 30, 2015 and the date of preliminary approval (or for home mortgage, between January 29, 2018 and the date of preliminary approval), held valid and unexpired DACA status, applied for credit from the Wells Fargo credit card, student lending, small business lending, personal lines and loans, or mortgage lines of business, were denied as set forth in the Class Data produced by Wells Fargo, and were not California residents as set forth in the Class Data produced by Wells Fargo.[8]  SA § 1.9.1.

Because Wells Fargo did not record whether applicants had DACA, its data set listing potential Class Members consists of approximately 330,000 applicants in the United States with valid SSNs who did not meet Wells Fargo's citizenship or immigration status requirements—DACA and non-DACA applicants alike, including work-authorized non-citizens with employment visas and recipients of temporary protected status ("TPS"), all of whom are eligible for SSNs.  However, limiting this data set based on characteristics common to DACA recipients, such as U.S. addresses and valid SSNs, suggest that the California and National Classes (*i.e.*, those with DACA), comprise at least 50,000 individuals.

---

[8]     Both the National and California Classes limit the relevant period for home mortgage to January 29, 2018 through preliminary approval.  January 29, 2018 is two years before the parties mediated the case for the third time and laid the groundwork for a settlement in principle.
     Excluded from both Classes are Wells Fargo, all officers, directors, and employees of Wells Fargo, and their legal representatives, heirs, or assigns, and any Judges to whom the Action is assigned, their staffs, and their immediate families.

### B. Settlement Overview

The settlement provides two important forms of relief for the Class Members: (1) programmatic relief under which Wells Fargo will change its lending practices for its credit card, student lending, small business lending, personal lines and loans, and mortgage LOBs to extend unsecured credit to current and valid DACA recipients on the same terms and conditions as U.S. citizens; and (2) a Settlement Fund of $4,750,000 to $13,100,000, depending on the number of claimants, to compensate for the harm they allege that they suffered.  The parties have agreed that the Settlement shall be administered as if governed by 28 U.S.C. § 1715, and Wells Fargo has agreed to provide CAFA Notice as required by that statute.

#### 1. Programmatic Relief

This settlement provides exceptional programmatic relief:  in connection with the settlement, Wells Fargo will change its lending practice for its credit card, student lending, small business lending, personal lines and loans, and home mortgage LOBs to extend unsecured credit to current DACA recipients on the same terms and conditions as U.S. citizens, so long as there is an appropriate product.  SA § 3.2.1.  Wells Fargo has also agreed to annually provide to Class Counsel a written description explaining the status of the Programmatic Relief for a period of two years.  *Id.* § 3.2.2.

While it is difficult to quantify the benefit that this programmatic relief will convey to DACA recipients in the years to come, these changes will be extremely valuable.  If even 10,000 DACA recipients nationwide apply for credit each year for the next four years, and the availability of such credit is worth $2,000 (half the statutory penalty for depriving someone access to loans and credit under the Unruh Act), these changes are worth $80,000,000.  Moreover, this figure may be conservative, as many more individuals will get even greater economic opportunity from these changes in the coming years.

#### 2. Monetary Relief

The $18,700,000 settlement amount will cover: (a) up to $13,100,000 in cash payments to Class Members; (b) incentive awards of $25,000 for each of the six Plaintiffs, totaling $150,000;

(c) settlement administration costs, not to exceed $450,000; and (d) up to $5,000,000 in attorneys' fees and costs.  SA §§ 3.3.1; 3.3.4; 3.37; 15.1; 15.2.

Wells Fargo will create separate settlement funds for the California Class and the National Class ("California Fund" and "National Fund," respectively), both of which will be funded based on claims made by Class Members.  *Id.* §§ 1.44.1; 1.44.2.  Wells Fargo's Class Data will determine how many claims each Class Member may make, *i.e.*, how many times each Class Member was denied a loan or credit card in the relevant period.  *Id.* §§ 1.28; 1.47.  In other words, as long as a Class Member makes one valid claim, they will receive a cash payment for each credit denial that appears in the Class Data.  *Id.*  For the California Fund, (1) the first 2,000 Verified Claims[9] from California Class Members shall add $2,500 per claim to the fund, up to $5,000,000; (2) the next 3,000 Verified Claims from California Class Members shall add $2,000 per claim to the fund, up to $6,000,000; and (3) the next 2,000 Verified Claims from California Class Members shall add $800 per claim to the fund, up to $1,600,000.  *Id.* § 3.3.2.  The California Fund will have a floor of $4,700,000 and a cap of $12,600,000, depending on the number of claimants.  *Id.* § 3.3.4.

The National Fund will be created by adding $100 to the fund for every Verified Claim from National Class Members, up to and not to exceed $500,000.  *Id.* § 3.3.5.  The amount in each fund will be determined based on Verified Claims and will only be funded up to the number of Verified Claims.  *Id.* § 1.44.  As explained in detail below, California Class Members who submit a Verified Claim shall be paid *pro rata* from the California Fund and National Class Members shall be paid *pro rata* from the National Fund.  *Id.* §§ 3.3.3; 3.3.6.  In other words, National Class Members will receive up to $100 per Verified Claim and California Class

---

[9]     "Verified Claim" means a written request, submitted via a Claim Form, submitted by a Settlement Class Member to the Settlement Administrator, pursuant to the instructions set forth in the Claim Form, including Official Documentation.  SA § 1.47.  "Verified Claim Form" means a Claim Form that is (a) fully completed and properly executed showing the Verified Claimant is entitled to Claim Settlement Relief, including a fully completed and properly executed Form W-9, (b) timely returned to the Settlement Administrator, (c) validated by the Settlement Administrator pursuant to the procedures set forth in this Agreement, and (d) which includes Official Documentation.  *Id.* § 1.48.

MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT
CASE NO. 17-cv-00454-MMC

Members will receive an amount up to $2,500 per claim, depending on the number of Verified Claims.

Following preliminary approval of the Settlement Agreement, Wells Fargo will provide the Settlement Administrator and Class Counsel with the updated Class Data.[10]  *Id.* § 7.2.  The Settlement Administrator will issue notice via U.S. mail and email (where an email address is available) to all individuals on the Notice List within 35 days of the preliminary approval order. SA § 7.3.  Those individuals will have 60 days to make a claim in the settlement or 45 days to exclude themselves or file an objection with the Court.  *Id.* §§ 1.6; 1.29; 1.31.

To make a claim in, opt out of, or object to the settlement, Class Members will be required to sign and return a one-page form ("Claim Form") to the Settlement Administrator.  *Id.* §§ 5.2; 5.3; 11.1; 12.3.  The Claim Form will require the recipient to affirm that they: (1) had valid and unexpired DACA status at the time they applied for one of the relevant credit products; (2) were denied at least one of those products; and (3) that they have and are prepared to provide official documentation to verify that status.  *Id.* §§ 5.2; 5.3.  Class Members seeking to opt-out of or object to the settlement will, in addition, be asked to demonstrate their current or former valid and unexpired DACA status by providing (1) an I-797 Approval Notice from an I-821-D and/or (2) a work authorization card containing the code "C-33" ("Official Documentation").  *Id.* §§ 11.1; 12.3.  Claim Forms may be submitted online or by email or mail.  *Id.* Ex. 2 (Claim Form). Consistent with current best practices, the Settlement Administrator will maintain a dual-language (English-Spanish) website providing the Notice, Claim Form, Settlement Agreement and Exhibits, key motions, and orders.  *Id.* § 7.8.  The Claims Administrator will also create a dual-language (English-Spanish) toll-free phone number.  *Id.* § 6.2.  A reminder notice will be issued by email only, if available, 30 days into the claims period.  *Id.* § 7.6.

After final approval of the Settlement, the Settlement Administrator will contact the

---

[10]     The Class Data will identify (i) individuals who were denied student loans, credit cards, small business loans, personal loans, and home mortgages, including the number of denials of each of the preceding credit products; (ii) during the class period; (iii) based on agreed-to denial codes related to their residency status; (iv) where the individual provided an SSN, a U.S. address, and were not listed as a U.S. citizen or LPR.

individuals who submitted Claim Forms and request documentation to demonstrate that they have valid and unexpired DACA status, or had valid DACA status at the time of their denial. *Id.* § 5.2.2. Upon timely receiving this information, the Settlement Administrator will validate the Claim Form and documentation and, if consistent with the terms of the Settlement Agreement, will deem the claim to be one or more Verified Claims. *Id.* If at any point during the claims period an individual submits a Claim Form or Official Documentation that the Settlement Administrator deems deficient, the Settlement Administrator will promptly notify that individual and Class Counsel, and the individual will have 14 days to cure any deficiency. *Id.* § 5.4. A Class Member may make only one Verified Claim per denied application. *Id.* §§ 5.4.3; 5.3.3. Joint or multiple borrowers who are denied on a single application will be treated as a single application and their *pro rata* share will be divided equally per applicant. *Id.* §§ 5.4.3; 5.3.3.

After this phase, the Settlement Administrator will advise Wells Fargo of the amount of each Settlement Fund based on the number of Verified Claims. *Id.* § 3.3.10. Within 21 days of receiving notice of the amount of the Settlement Funds, Wells Fargo will transfer those funds to the Settlement Administrator, which will issue and mail checks to Class Members. *Id.* §§ 3.3.2; 3.3.5.

In exchange for the consideration described above, each Class Member shall release Wells Fargo of any and all claims (the "Released Claims") relating to Wells Fargo's denial of their loan applications based on alienage, lack of citizenship and/or immigration status, including, but not limited to, any claims under 42 U.S.C. § 1981, the California Unruh Act, Cal. Civil Code §§ 51 and 52 *et seq.*, other state civil rights statutes, the Equal Credit Opportunity Act, and the Fair Credit Reporting Act.[11] SA §§ 1.36; 10. The Class Representatives will also agree to a general

---

[11] Although this release is broader than the claims pled in the complaint, Class Counsel are unaware of any additional viable claims it would extinguish. Beyond the Unruh Act, no other state law civil rights statutes provide comparable statutory penalties for claims related to the denial of Class Members' loan applications based on alienage, lack of citizenship and/or immigration status. These special circumstances justify a broadened release. *See, e.g., Seguin v. Cty. of Tulare*, No. 16 Civ. 01262, 2018 WL 1919823, at *5 (E.D. Cal. Apr. 24, 2018) (a broad release was permissible where the settlements reflected a reasonable compromise achieved through negotiation).

release of all Released Claims against Wells Fargo for claims related to the denial of their loan applications.  *Id.* § 1.36; 10.3.

After consulting with the proposed Settlement Administrator about its experience and, based on their communications with Class Members to date and the realities of DACA recipients' lives, Plaintiffs estimate that 5% to 15% of the Class Members will return Claim Forms.  *See, e.g.*, *Donnenfeld v. Petro, Inc.*, No. 17 Civ. 2310 (E.D.N.Y. Mar. 5, 2020), ECF No. 80-1 (8,074/91,807 or 8.6% of class members filed claims); *In re MyFord Touch Consumer Litig.*, No. 13 Civ. 3072 (N.D. Cal. Nov. 7, 2019), ECF No. 542 (claims submitted on behalf of 4.5% of class); *Edwards v. Hearst Commc'ns*, No. 15 Civ. 9279 (S.D.N.Y. Apr. 4, 2019), ECF No. 310 (294,748/3,930,421 or 7% of class members filed claims); *see also* Miazad Decl. ¶ 36.  Plaintiffs estimate that the return rate for California Class Members will be on the higher end of that range, considering the high amount of the settlement award per denial, and that the return rate for National Class Members will fall on the lower end of the range.  Miazad Decl. ¶ 37.

## C.    Class Representative and Individual Plaintiff Service Awards[12]

The Settlement provides that, subject to Court approval, Wells Fargo will pay Plaintiffs Perez, Barajas, Rodas, Villafuerte, Acosta, and Vedoy service awards of $25,000 each.  SA § 15.2.  These payments are intended to compensate them for (a) the significant time and effort over the past three years they have spent on behalf of the Class assisting Class Counsel with the prosecution of these claims, (b) the resulting significant value they have conferred to Class Members, and (c) the significant exposure and risk they incurred by exposing themselves as DACA recipients and taking a leadership role in a lawsuit that has garnered broad media coverage.[13]  *See, e.g.*, *Galeener v. Source Refrigeration & HVAC, Inc.*, No. 13 Civ. 04960, 2015

---

[12]    This Section and the next Section preview, at a general level, the more detailed factual and legal presentation Plaintiffs will provide in their fee petition and request for approval of Incentive Awards to be filed prior to the Final Approval Hearing.

[13]    *See, e.g.*, Molina, Alejandra, *Lawsuit claiming Wells Fargo illegally denied loans to DACA beneficiaries can go forward, court says*, Aug. 4, 2017, available at: https://www.pe.com/2017/08/04/lawsuit-claiming-wells-fargo-illegally-denied-loans-to-daca-beneficiaries-can-go-forward-court-says/; Dinzeo, Maria, *Wells Fargo Can't Duck Dreamers' Claim of Lending Bias*, Aug. 4, 2017, available at: https://www.courthousenews.com/wells-fargo-cant-duck-dreamers-claim-lending-bias/.

MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT
CASE NO. 17-cv-00454-MMC

1  WL 12976106, at *3 (N.D. Cal. Aug. 20, 2015) (Chhabria, J.) ($27,000 and $25,000 to two class

2  representatives); *Buccellato v. AT&T Operations, Inc.*, No. 10 Civ. 00463, 2011 WL 3348055, at

3  *2 (N.D. Cal. June 30, 2011) (Koh, J.) ($20,000 to lead plaintiff); *Lewis v. Wells Fargo & Co.*,

4  No. 08 Civ. 2670, slip op. at 4 (N.D. Cal Apr. 29, 2011), ECF No. 315 (Wilken, J.) ($22,000 and

5  $20,000 for named plaintiffs); *Ross v. U.S. Bank Nat'l Ass'n*, No. 07 Civ. 2951, 2010 WL

6  3833922, at *4 (N.D. Cal. Sept. 29, 2010) (Illston, J.) ($20,000 service award for each of four

7  class representatives); *Glass v. UBS Fin. Servs., Inc.*, No. 06 Civ. 4068, 2007 WL 221862, at *16-

8  17 (N.D. Cal. Jan. 26, 2007) (Chesney, J.) ($25,000 to each of four class representatives).  For

9  these reasons, the incentive awards are appropriate and do not undermine the adequacy of the

10  Plaintiffs as Class Representatives.

11        **D.       Attorneys' Fees and Costs**

12        The Settlement Agreement allows Class Counsel to request an award of attorneys' fees

13  and expenses of up to $5,000,000.  SA § 15.1.  In a non-common fund case brought under fee-

14  shifting statutes such as Section 1981 and the Unruh Act, the lodestar method for awarding

15  attorneys' fees is appropriate.  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941-42

16  (9th Cir. 2011); *Ross v. Trex Co.*, No. 09 Civ. 670, 2013 WL 12174133, at *1 (N.D. Cal. Dec. 16,

17  2013).  The lodestar figure is "presumptively reasonable."  *Cunningham v. Cty. of Los Angeles*,

18  879 F.2d 481, 488 (9th Cir. 1988).  Additionally, the fact that the award of attorneys' fees and

19  costs was negotiated separately and will not be paid out of the relief available to the class

20  supports a finding that the requested fee award is reasonable.  *Fulford v. Logitech, Inc.*, No. 08

21  Civ. 204, 2010 WL 807448, at *1 (N.D. Cal. Mar. 5, 2010) (Chesney, J.).

22        Class Counsel's lodestar in this hotly contested litigation is approximately $5,049,000,

23  based on approximately 10,000 attorney hours over the course of three and a half years of

24  litigation, and Plaintiffs' costs are approximately $332,000.  Plaintiffs intend to request an award

25  of attorneys' fees and expenses of $5,000,000.  Class Counsel have performed substantial work to

26  earn this fee, including defeating four motions to dismiss and/or strike the complaint, amending

27  the complaint five times, briefing class certification, retaining and preparing three experts,

28  engaging in extensive discovery, which led to protracted disputes including approximately 12

1   discovery dispute letters filed before Magistrate Judge Laporte, preparing for and attending three

2   mediations, and negotiating the complex Settlement.  Further, the fees and costs were negotiated

3   separately from the Settlement Fund.

4       Class Counsel's lodestar will increase during the coming months while Class Counsel

5   continues to work to secure preliminary approval, oversee the dissemination of notice, respond to

6   Class Member inquiries, and brief and seek final approval.  *Johnson v. Triple Leaf Tea Inc.*, No.

7   14 Civ. 1570, 2015 WL 8943150, at *8 (N.D. Cal. Nov. 16, 2015) (Chesney, J.) (accounting for

8   "future attorney time" in decision whether attorneys' fees were reasonable).

9       **E.    Settlement Administration Costs**

10      The Settlement Agreement provides that Wells Fargo will pay the cost of a Settlement

11  Administrator, up to $450,000.  The parties have selected JND Legal Administration Co. ("JND")

12  as Settlement Administrator.  The parties selected JND by gathering bids from three settlement

13  administrators from a list of four approved settlement administrators proposed by Wells Fargo.

14  Miazad Decl. ¶ 47.  Because the method of notice and claims payment processes are delineated in

15  the Settlement Agreement, no new methods were proposed by the proposed settlement

16  administrators, and instead the parties evaluated whether the proposed settlement administrators

17  were equipped to handle the notice and claims process as negotiated by the parties.  *Id.* ¶ 48.

18  Class Counsel has retained JND to administer the claims process in 14 cases in the past two years,

19  including cases with complex claims processes like this one.  *See, e.g.*, *del Toro Lopez v. Uber

20  Techs., Inc.*, No. 17 Civ, 6255, 2018 WL 5982506, at *14 (N.D. Cal. Nov. 14, 2018); Miazad

21  Decl. ¶ 50 (listing cases JND has worked on with Class Counsel in the past two years).

22      JND has agreed to perform all administration work set forth in the Settlement Agreement

23  for a will-not-exceed cost of $450,000, which JND anticipates being sufficient to cover the total

24  costs of settlement administration.  SA § 6.  The Settlement Administrator's maximum fee

25  amounts to approximately 2.4% of the $18,600,000 maximum Settlement Fund, which is

26  reasonable in light of the amount and complexity of the work to be performed (especially

27  processing and verifying the Claim Forms, which will require careful manual review), and is in

28  line with settlement administration fees in comparable cases.  *See, e.g.*, *Pappas v. Naked Juice Co*

*of Glendora, Inc.*, No. 11 Civ. 8276, 2014 WL 12382279, at *19 (C.D. Cal. Jan. 2, 2014) ($816,000 administration fee, equal to 9% of $9 million settlement); *Covillo v. Specialtys Cafe*, No. 11 Civ. 00594, 2013 WL 5781574, at *7 (N.D. Cal. Oct. 25, 2013) (up to $48,741 administration fee, equal to 2.4% of $2 million settlement).

**F.     Cy Pres Awardees**

Plaintiffs have negotiated a settlement that requires Wells Fargo to pay at least $4,750,000. In the event that the combined payments to Class Members from the California and National Settlement Funds is less than this floor, the amount between the total distributions to Class Members and $4,750,000 shall be distributed equally between TheDream.US and UnidosUS.[14] *Id.* § 3.3.9. TheDream.US is a non-profit that provides college scholarships to immigrant youth including DACA recipients and UnidosUS is a non-profit that serves the Hispanic community through research, policy analysis, legislative advocacy, and community-level programming. Miazad Decl. ¶¶ 59, 61. Both organizations have a national reach and work to provide equal opportunity to the DACA community. *See In reEasysaver*, 906 F.3d at 761-62 (*cy pres* recipients should be selected in light of the objectives of the underlying statute and the interests of the class). Class Counsel Thomas Saenz served on the Advisory Board of TheDream.US but resigned from that Board in June 2020. *Id.* ¶ 60. Class Counsel do not have any other relationships, presently or in the past, with these organizations. *Id.* ¶ 60, 62.

**IV.     ARGUMENT**

Settlement approval "involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *Nat'l Rural Telecomm. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004); *see also* Manual for Complex Litigation §§ 21.632-634 (4th ed. 2004). Preliminary approval requires two elements: First, the court must determine that the settlement class meets the requirements for class certification if it has not yet

---

[14]     *See Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990) (holding that *cy pres* distribution is appropriate "for the limited purpose of distributing the unclaimed funds"); *In re Easysaver Rewards Litig.*, 906 F.3d 747, 761 (9th Cir. 2018) (same).

MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT
CASE NO. 17-cv-00454-MMC

been certified, Fed. R. Civ. P. 23(a), (b), and second, the court must determine that the settlement is fair, reasonable, and adequate, Fed. R. Civ. P. 23(e)(2).  *Hanlon*, 150 F.3d at 1025-26.

###### A.      Certification of the Rule 23 Classes Is Proper.

For settlement purposes, the parties agree to certification of the California Class and the National Class.[15]  "The validity of use of a temporary settlement class is not usually questioned."  Alba Conte & Herbert B. Newberg, 4 Newberg on Class Actions § 11:22 (4th ed. 2002).  The relevant factors also weigh in favor of certification.

###### 1.      Rule 23(a) Is Satisfied.

<u>First</u>, numerosity is met because joinder of Class Members would be impractical.  Fed. R. Civ. P. 23(a)(1).  Wells Fargo's data on applicants who did not meet its citizenship or immigration status requirements – refined based on characteristics common to DACA recipients – reveals that the classes here likely consist of thousands of individuals.  The Notice List contains approximately 330,000 individuals and Class Counsel believe 20-25%, or up to approximately 80,000 individuals, are DACA recipients who could be National or California Class Members.  Miazad Decl. ¶¶ 34-35.  Further, potential Class Members are "geographically dispersed" nationwide, including within California, which supports a finding of numerosity.  *See Civil Rights Educ. & Enf't Ctr. v. RLJ Lodging Tr.*, No. 15 Civ. 224, 2016 WL 314400, at *6 (N.D. Cal. Jan. 25, 2016) (noting that "joinder may be impracticable where a class is geographically dispersed").

<u>Second</u>, commonality is met because "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The Supreme Court has stated that the focus is on whether there are common issues of fact among class members and whether class treatment will "generate common *answers* apt to drive the resolution of the litigation."  *Abdullah v. U.S. Sec'y Assocs.*,

---

[15]      Plaintiffs pled three nationwide classes and two California subclasses in the 5AC, ECF No. 267, and in Plaintiffs' Motion for Class Certification, ECF No. 289.  The Settlement Agreement consolidates the three nationwide classes into the National Class and the two California subclasses into the California Class.  Substantively, the classes are the same; they cover the same products offered by the same lines of business within the same time period, and both encompass denials made under the same internal Wells Fargo denial codes.  The only difference is in the inclusion of home mortgage, which Plaintiffs address below.

731 F.3d 952, 957 (9th Cir. 2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  Here, common questions include whether Wells Fargo's lending policies deny Plaintiffs and Class Members the opportunity to be considered for credit because of their alienage or DACA status and whether Wells Fargo's lending policies violate Section 1981 or the Unruh Act.  Further, Plaintiffs assert liability based on uniform lending policies that apply to all Class Members.[16]

Third, typicality is satisfied.  Rule 23 typicality requires a finding that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Under the rule's "permissive" standard, "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Johnson*, 2015 WL 8943150, at *3 (quoting *Hanlon*, 150 F.3d at 1020).  Here, the Class Representatives are typical of the classes they propose to represent because (1) each lived in California or the United States, (2) each held DACA and a valid SSN when they applied for a credit product from one or more of the five Wells Fargo LOBs at issue in this Settlement; and (3) each alleged that he or she was denied credit because they were not U.S. citizens or LPRs pursuant to Wells Fargo's policies.[17]

Fourth, Plaintiffs have fairly and adequately protected the interests of the class and will continue to do so.  Fed. R. Civ. P. 23(a)(4).  The adequacy requirement is met where the class representatives: (1) have common, and not antagonistic, interests with unnamed class members, and (2) will vigorously prosecute the interests of the class through qualified counsel.  *Hanlon*, 150 F.3d at 1020; *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

---

[16]     *See, e.g.*, *Stevens v. Harper*, 213 F.R.D. 358, 377 (E.D. Cal. 2002) (in civil rights context, "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members").

[17]     At the pleading stage, the Court struck references to home mortgages from the Complaint, explaining that Plaintiffs had not identified any plaintiff whose claim was "typical" of putative class members who had sought and were denied a home mortgage.  ECF No 197.  In the course of settlement negotiations, Wells Fargo produced the home mortgage policy, which Plaintiffs have analyzed and concluded is substantially similar to the student loan and personal loan lines of business, such that the theory of liability is typical between Class Representatives and Class Members.  Miazad Decl. ¶ 26.  Moreover, the harm of denial based on DACA status is the same.  In this context, including home mortgage in the Settlement does not affect typicality.

MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT
CASE NO. 17-cv-00454-MMC

1   Adequacy is met because Class Representatives have the same interests as other Class

2   Members and have shown that they can fairly and adequately protect Class Members' interests.

3   Like all Class Members, Class Representatives were denied credit by Wells Fargo under specific

4   denial codes pursuant to Wells Fargo's lending policies.  Miazad Decl. ¶ 52.  Class

5   Representatives have no conflicts of interest with the Class Members and, indeed, California

6   Class Members stand to benefit substantially from Class Representatives' pursuit of statutory

7   damages on their behalf.  Class Representatives (along with Individual Plaintiffs) have vigorously

8   represented the interests of their fellow Class Members and devoted substantial time to the

9   prosecution of this action, including by responding to extensive discovery, reviewing documents

10  produced by Wells Fargo, sitting for depositions, and having numerous phone calls and in-person

11  meetings with counsel.  *Id.* ¶ 53.

12  In addition, Plaintiffs are represented by adequate counsel.  Outten & Golden LLP and the

13  Mexican American Legal Defense and Educational Fund ("MALDEF"), have extensive

14  experience litigating complex civil rights and employment class actions and have vigorously

15  prosecuted this action on behalf of Plaintiffs through extensive motion practice and fact and

16  expert discovery.  Miazad Decl. ¶¶ 4-9 (collecting cases); Declaration of Belinda Escobosa

17  Helzer ("Helzer Decl.") ¶¶ 5-9 (same); *see also, e.g.*, *Walsh v. CorePower Yoga LLC*, No. 16 Civ.

18  05610, 2017 WL 589199, at *8 (N.D. Cal. Feb. 14, 2017) ("[Outten & Golden] ha[s] a proven

19  track record in the prosecution of class actions as they have successfully litigated and tried many

20  major class action cases.").

21  For these reasons, Class Counsel satisfy the adequacy requirement of Rule 23(a).

22  **2.      Certification Is Proper Under Rule 23(b)(3).**

23  Rule 23(b)(3) requires that common questions predominate over individual ones, and that

24  a class action is superior to other available methods for adjudicating the controversy.  Fed. R. Civ.

25  P. 23(b)(3).  Both of these requirements are met here.

26  The proposed classes, the California Class and the National Class, are sufficiently

27  cohesive to satisfy predominance.  *Amchem*, 521 U.S. at 623.  Predominance does not require

28  "that each element of [a plaintiff's] claim [is] susceptible to classwide proof."  *Amgen Inc. v.*

*Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (internal quotation marks and citation omitted).  Rather, "[t]he predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting William B. Rubenstein, Newberg on Class Actions § 4:50 (5th ed.)).  Here, Plaintiffs challenge policies that apply to all Class Members.  Common questions as to their nature and legality can be adjudicated collectively and will drive the resolution of plaintiffs' claims.[18]

Superiority rests on factors like individual class members' desire to bring individual actions and the utility of concentrating the litigation in one forum.  Fed. R. Civ. P. 23(b)(3).  Here, "there is no indication, that class members seek to individually control their cases, that individual litigation is already pending in other forums, or that this particular forum is undesirable for any reason."  *Tierno v. Rite Aid Corp.*, No. 05 Civ. 02520, 2006 WL 2535056, at *11 (N.D. Cal. Aug. 31, 2006); *see also Amchem*, 521 U.S. at 615.  Few Class Members would invest the time and money, plus the stress inherent in litigation, for a chance to possibly recover modest damages.  In addition, individual lawsuits from hundreds of plaintiffs would be wasteful and inefficient for the court system.  *See, e.g.*, *Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*, No. 05 Civ. 2320, 2006 WL 2642528, at *11 (N.D. Cal. Sept. 14, 2006).  Because the class mechanism will achieve economies of scale for Class Members, conserve judicial resources, and preserve public confidence in the system by avoiding repetitive proceedings and preventing inconsistent adjudications, superiority is met.

### 3.    Plaintiffs' Counsel Should Be Appointed as Class Counsel.

Adequacy of class counsel depends on (1) work performed on the matter, (2) experience, (3) knowledge of the law, and (4) resources counsel can commit.  Fed. R. Civ. P. 23(g)(1)(A).

---

[18]    *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 509, 538 (N.D. Cal. 2012) (predominance satisfied as to discrimination claims where plaintiffs challenged "specific employment practices" that applied "companywide"); *cf. Jones v. Wells Fargo Bank, N.A.*, No. B237282, 2015 WL 661757, at *8, 15 (Cal. Ct. App. Feb. 17, 2015) (affirming class certification for Unruh Act claims challenging Wells Fargo practices that resulted in race-based lending discrimination); *id.* at *14 ("Claims that a uniform policy was consistently applied to a group are proper for class treatment.").

1    Class Counsel readily satisfy these criteria, as set forth above.  *See supra* Part IV.A.1; *see also*

2    Miazad Decl. ¶¶ 4-9; Helzer Decl. ¶¶ 5-9.

3        **B.    The Settlement Is Fair, Reasonable, And Adequate**.

4        Once the Court has found class certification proper, the next step of the preliminary

5    approval process is to assess whether the settlement is "fundamentally fair, adequate, and

6    reasonable."  *Hanlon*, 150 F.3d at 1026.  Typically, the first-stage analysis inquires into "obvious

7    deficiencies," with preliminary approval granted if the settlement is non-collusive and within the

8    range of possible final approval.  *Walsh*, 2017 WL 589199, at *6 (quoting *In re Tableware

9    Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)).[19]

10       When considering whether to grant approval, courts often "put a good deal of stock in the

11   product of an arms-length, non-collusive, negotiated resolution."  *Rodriguez v. W. Publ'g Corp.*,

12   563 F.3d 948, 965 (9th Cir. 2009).  Courts may also assess the following factors, which are

13   assessed in greater detail at final approval.  These factors are: (1) "the strength of the plaintiffs'

14   case," "the risk, expense, complexity, and likely duration of further litigation," and "the risk of

15   maintaining class action status throughout the trial," (2) "the amount offered in settlement," (3)

16   "the extent of discovery completed and the stage of the proceedings," and (4) "the experience and

17   views of counsel."  *Hanlon*, 150 F.3d at 1026.  In addition, courts review "the presence of a

18   governmental participant" and "the reaction of the class members to the proposed settlement."  *Id.*

19   The former is not relevant, and the latter cannot be gauged at this stage.

20       **1.    Plaintiffs' Case Faced Significant Hurdles on Liability and Class
21           Certification.**

22       "Approval of a class settlement is appropriate when 'there are significant barriers

23   plaintiffs must overcome in making their case.'"  *Betancourt v. Advantage Human Resourcing,

24   Inc.*, No. 14 Civ. 01788, 2016 WL 344532, at *4 (N.D. Cal. Jan. 28, 2016).  Plaintiffs face

25   substantial obstacles to full recovery.  First, liability is far from guaranteed.  This litigation—a

26   

27   [19]    *See also Cancilla v. Ecolab, Inc.*, No. 12 Civ. 3001, 2015 WL 4760318, at *3 (N.D. Cal.
     Aug. 12, 2015) (focusing preliminary approval analysis on "noncollusive negotiations," the lack
28   of "obvious deficiencies" or "preferential treatment," and being "with[in] the range of possible
     approval"); Alba Conte & Herbert B. Newberg, 4 *Newberg on Class Actions*, § 13.15 (5th ed.).

MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT
CASE NO. 17-cv-00454-MMC

1   lending discrimination class action on behalf of DACA recipients—presents a novel theory with

2   numerous unsettled issues.  Other defendants in cases involving Section 1981 challenges on

3   behalf of DACA recipients have argued that DACA recipients are not "lawfully present" in the

4   United States to show that they are not members of a protected class under Section 1981 and

5   Wells Fargo may raise a similar argument.  Wells Fargo may also point to instances in which it

6   extended credit to DACA recipients through what it characterizes as an "exceptions process" as

7   proof that Wells Fargo does not discriminate against DACA recipients.  Wells Fargo could also

8   highlight events in Plaintiffs' credit history to show that they were not qualified for the credit

9   products they sought, regardless of their DACA status.  Finally, Wells Fargo has vigorously

10  contended that its lending policies are justified because DACA—which the current administration

11  has attempted to rescind—is a tenuous immigration status and a bank is justified in limiting credit

12  to applicants who might be subject to deportation orders at any time from eligibility for credit for

13  credit risk, business, compliance, and regulatory reasons.

14          Plaintiffs also face obstacles to obtaining class certification.  As explained above,

15  Plaintiffs cannot identify Class Members from Wells Fargo's data with certainty, which presents

16  manageability issues.  Wells Fargo could also argue that Plaintiffs cannot show commonality

17  because Wells Fargo did not have an explicit policy that made DACA recipients ineligible based

18  on their DACA status for the challenged credit products, or because some applicants would have

19  been denied credit regardless of immigration status.

20              **2.      The Settlement Amount Is Appropriate.**

21          "[P]erhaps the most important factor" courts consider in determining whether to grant

22  preliminary approval is "plaintiffs' expected recovery balanced against the value of the settlement

23  offer."  *Cotter v. Lyft, Inc*., 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016) (Chhabria, J.) (internal

24  quotation marks omitted).  Here, the monetary and programmatic relief provide excellent value

25  for Class Members.  Though the precise amount of the monetary awards per Class Member is not

26  yet known, under any scenario the monetary relief under the Settlement is likely to be a high

27  percentage of their maximum damages.  Similarly, the settlement provides the greatest degree of

28  programmatic relief possible.

California Class Members are eligible for individual awards of up to $2,500 per denial of a credit application, more than 60% of the statutory damages available under the Unruh Act for each discriminatory act.  Cal. Civil Code § 52(a) (providing statutory damages of $4,000 per violation); Miazad Decl. ¶ 31.  This is an excellent result for California Class Members.[20]  If a higher number of California Class Members submit Verified Claim forms – and because monetary awards are paid *pro rata* – individual awards may decrease to $1,800 per claim or lower.  Miazad Decl. ¶ 32.  However, even if 12,000 California Class Members submit Verified Claims – a substantially higher response rate than the parties anticipate – that would amount to awards of approximately $1,050 each, more than 25% of the $4,000 minimum damages under Unruh.  *Id.*  In light of the risks of an adverse judgment on the merits or class certification, even awards on the lower end of this range provide an excellent value to California Class Members.

The parties estimate that National Class Members will receive approximately $100 per denial.  Miazad Decl. ¶ 33.  This is an excellent benefit for National Class Members because Plaintiffs withdrew their claims for actual and economic damages under Section 1981 on behalf of the nationwide class of DACA recipients after consulting with economic experts who determined that significant obstacles existed to valuing and modeling actual or economic damages for a denial of credit where Class Members could potentially obtain the same credit elsewhere, or turn to savings accounts or loans from family members, as some Plaintiffs did.  *Id.*  Accordingly, Plaintiffs narrowed their damages claim under Section 1981 to only request equitable and injunctive relief.  ECF No. 267 (5AC) ¶ 95.  As nominal damages are considered "symbolic in nature," *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 872 (9th Cir. 2017), the monetary relief obtained for National Class Members in this action is excellent.

---

[20]   *See, e.g.*, *Betancourt*, No. 14 Civ. 1788, 2016 WL 344532, at *5 (N.D. Cal. Jan 28, 2016) (granting final approval of settlement providing approximately 9.7% of total maximum potential recovery if class members had prevailed on all claims); *Stovall-Gusman v. W.W. Granger, Inc.*, No. 13 Civ. 2540, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) (finding that a settlement constituting 7.3% of plaintiff's estimated trial award to be "within the range of reasonableness" (quoting *Ma v. Covidien Holding, Inc.*, No. 12 Civ. 2161, 2014 WL 360196, at *5 (C.D. Cal. Jan. 31, 2014))); *In re Heritage Bond Litig.*, No. 02 ML 1475, 2005 WL 1594403, at *19 (C.D. Cal. June 10, 2005) (calling a recovery of 36% of the total net loss an "exceptional result").

1    Plaintiffs also obtained the *maximum* degree of programmatic relief that Class Members

2 could possibly obtain.  Wells Fargo has agreed to extend unsecured credit to current and valid

3 DACA recipients on the same terms and conditions as U.S. citizens.  In other words, Wells Fargo

4 will *not* consider DACA as a factor in evaluating credit risk or in underwriting, which might

5 invariably lead to inferior credit terms.  All DACA recipients nationwide—not just Class

6 Members—will benefit from this programmatic relief.  DACA recipients have a great need for

7 access to credit and have encountered significant difficulty in obtaining it.[21]  As one of the largest

8 lenders in the country, the programmatic relief offered by Wells Fargo is a significant benefit to

9 Class Members (and DACA recipients nationwide) and is likely better than what could be

10 obtained by protracted litigation and trial.

11    **3.    The Extent of Discovery Supports Settlement.**

12    A settlement requires adequate discovery.  The touchstone of the analysis is whether "the

13 parties have sufficient information to make an informed decision about settlement," including

14 formal and informal discovery.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir.

15 2000) (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)).  Here,

16 Plaintiffs have litigated these claims zealously for more than three years, conducting robust

17 formal discovery along the way.  Specifically, Plaintiffs obtained nearly 60,000 pages of

18 discovery from Wells Fargo, consisting of emails, lending and underwriting policy and procedure

19 documents, and documents relating to exceptions and complaints filed by applicants.  Miazad

20 Decl. ¶¶ 13-14.  Class Counsel deposed nine fact and expert witnesses and also worked closely

21 with three experts to analyze various issues implicated in the case, including underwriting and

22 immigration.  *Id*. ¶¶ 16-17.  Wells Fargo deposed all six Plaintiffs and Plaintiffs' three experts,

23 and sought extensive written discovery from Plaintiffs, including extensive documentation about

24

25 [21]    More than 800,000 individuals have been approved under DACA in the United States.
26 U.S. Citizenship & Immigration Servs., *Approximate Active DACA Recipients: Country of Birth As of February 28, 2019* at 5,
27 https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/ Immigration%20Forms%20Data/All%20Form%20Types/DACA/2_Approximate_Active_DACA
28 _Recipients_Demographics_-_Feb_28_2019.pdf.

MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT
CASE NO. 17-cv-00454-MMC

their credit history and attempts to mitigate their denial of credit with Wells Fargo. *Id.* ¶¶ 14-17. While the parties were negotiating the settlement agreement in this matter, Wells Fargo produced its home mortgage policy and the parties met and conferred regarding the details of the policy, concluding it was appropriate to include in the settlement. *Id.* ¶ 26. Thus, the Settlement results from Class Counsel's informed judgment about the strengths and weaknesses of the claims.

### 4. Counsel's Experience and Views Support Approval.

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *DIRECTV, Inc.*, 221 F.R.D. at 528 (quoting *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997)). "[P]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation[.]" *Rodriguez*, 563 F.3d at 967.

Class Counsel are some of the most experienced class action litigators in the country. Miazad Decl. ¶¶ 4-9; Helzer Decl. ¶¶ 5-9. Class Counsel specialize in prosecuting complex employment and civil rights class actions, and over many years have successfully—and unsuccessfully—litigated many such cases, putting them in a strong position to weigh the strengths and weaknesses of Plaintiffs' claims and Wells Fargo's defenses. *Id.*; *see also* Ex. B (listing comparable past distributions). Based on their extensive experience, Class Counsel believe that the Settlement is fair, reasonable, and adequate.

### 5. The Parties Participated in Arms-Length Negotiations Before an Experienced Neutral Mediator.

A settlement reached "in good faith after a well-informed arms-length negotiation" is presumed to be fair. *Fernandez v. Victoria Secret Stores, LLC*, No. 06 Civ. 04149, 2008 WL 8150856, at *4 (C.D. Cal. July 21, 2008).[22] Here, the settlement easily meets the rigorous scrutiny required in this District and by *Roes, 1–2*, for both substantive and procedural reasons. First, the Settlement is substantively strong, providing excellent monetary relief and robust programmatic relief. Second, the Settlement is procedurally sound, (a) having been reached after

---

[22]     *See also Wren v. RGIS Inventory Specialists*, No. 06 Civ. 05778, 2011 WL 1230826, at *6 (N.D. Cal. Apr. 1, 2011); *Tijero v. Aaron Bros., Inc.*, 301 F.R.D. 314, 325 (N.D. Cal. 2013) (private mediation "support[s] the conclusion that the settlement process was not collusive").

MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT
CASE NO. 17-cv-00454-MMC

extensive, hard-fought adversarial litigation, with extensive discovery and motion practice, (b) with no parallel litigation that could give rise to reverse auction concerns, and (c) after three separate mediation sessions over the course of a year and a half, overseen by a highly experienced mediator with particular expertise in complex class actions.  Miazad Decl. ¶¶ 10-27; 41.

### C.   The Proposed Notice Is Clear and Adequate.

The proposed Notice is the "best notice that is practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B), and is "reasonable," Fed. R. Civ. P. 23(e)(1).  The Notice and Claim Form are consistent with Northern District of California's Procedural Guidance for Class Action Settlements and modern best practices set forth by the Federal Judicial Center.[23]  The Notice and Claim Form are easily understandable and include: (1) contact information for Class Counsel to answer questions; (2) the address for a website maintained by the Settlement Administrator that will link to important documents in the case; and (3) instructions on how to access the case docket via PACER or in person at any of the Court's locations.  The Notice will state the date of the final approval hearing, that the date may change without further notice to the Class, and that Class Members should check the settlement website or the Court's PACER site to confirm that the date has not been changed.  The Notice explains the deadlines for objecting, opting out, and submitting a Claim Form.  SA Ex. 1.

The Claim Form is clear, user-friendly, and focused on a few key relevant facts to which Class Members have ready access.  The Claim Form is helpfully pre-printed with individualized information in customized paper copies.  It will also be available online, so that Class Members can submit Claim Forms via a secure online submission form.  In addition, Class Counsel will assist the Settlement Administrator in responding to Class Member questions, helping them file Claim Forms and navigate the process generally.

---

[23]   *See Illustrative Forms of Class Action Notices: Overview*, Fed. Judicial Ctr., https://www.fjc.gov/content/301253/illustrative-forms-class-action-notices-introduction (last visited June 16, 2020).

## V.   A FINAL APPROVAL HEARING SHOULD BE SCHEDULED.

Plaintiffs, in consultation with Wells Fargo, propose the following schedule for finalizing and implementing the Settlement:

| Event | Proposed Date |
|---|---|
| **Preliminary Approval Hearing** | **July 10, 2020** |
| Court enters Preliminary Approval Order* | July 24, 2020 |
| WF provides class list data to Settlement Administrator | August 7, 2020 |
| Settlement Administrator disseminates Notice | August 28, 2020 |
| Settlement Administrator sends Reminder notices | September 25, 2020 |
| Deadline for Class Members to file Claim Forms, opt out, and/or object | October 12, 2020 |
| Plaintiffs file Fee and Incentive Award Motions | October 23, 2020 |
| Deadline for Class Members to file Claim Forms | October 27, 2020 |
| WF deadline to terminate settlement | November 12, 2020 |
| Plaintiffs file Final Approval motion | November 13, 2020 |
| **Final Approval Hearing** | **December 4, 2020** |
| Final Approval Order* | December 18, 2020 |
| Effective Date (assuming no appeals)* | January 22, 2021 |
| WF funds Settlement | April 12, 2021 |
| Settlement Administrator mails checks to Class | April 17, 2021 |

* Assumed date for purposes of calculating subsequent dates.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) certify, for settlement purposes only, settlement classes pursuant to Federal Rule 23(a) and 23(b)(3); (2) grant preliminary approval of the Settlement; (3) appoint Plaintiffs Rodas, Villafuerte, Vedoy, and Acosta as the Class Representatives, their counsel as Class Counsel, and JND as Settlement Administrator; (4) approve mailing to the Class Members the proposed Notice; and (5) schedule a hearing for final approval of the Settlement.

MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT
CASE NO. 17-cv-00454-MMC

1    Dated: June 16, 2020                    Respectfully submitted,

2                                            By: /s/ *Ossai Miazad*
3                                                Ossai Miazad

4                                            Ossai Miazad*
                                             Michael N. Litrownik*
5                                            OUTTEN & GOLDEN LLP
                                             685 Third Avenue, 25th Floor
6                                            New York, NY 10017
                                             Telephone: (212) 245-1000
7                                            Facsimile:  (646) 509-2060
                                             om@outtengolden.com
8                                            mlitrownik@outtengolden.com
9                                            estork@outtengolden.com

10                                           Daniel S. Stromberg*
                                             Hannah Cole-Chu*
11                                           OUTTEN & GOLDEN LLP
                                             601 Massachusetts Avenue
12                                           Second Floor West Suite
                                             Washington, D.C. 20001
13                                           Telephone: (202) 847-4400
                                             Facsimile:  (202) 847-4410
14                                           dstromberg@outtengolden.com
                                             hcolechu@outtengolden.com
15

16                                           Jahan C. Sagafi (Cal. Bar No. 224887)
17                                           Rachel Dempsey (Cal. Bar No. 310424)
                                             OUTTEN & GOLDEN LLP
18                                           One California St., 12th Floor
                                             San Francisco, California 94111
19                                           Telephone: (415) 638-8800
                                             Facsimile:  (415) 638-8810
20                                           jsagafi@outtengolden.com
                                             rsun@outtengolden.com
21                                           rdempsey@outtengolden.com
22

23                                           Thomas A. Saenz (Cal. Bar No. 159430)
                                             Belinda Escobosa Helzer (Cal. Bar
24                                           No. 214178)
                                             MEXICAN AMERICAN LEGAL DEFENSE
25                                           AND EDUCATIONAL FUND
                                             634 S. Spring St., 11th Floor
26                                           Los Angeles, CA 90014
                                             Telephone: (213) 629-2512
27                                           Facsimile:  (213) 629-0266
28

MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT
CASE NO. 17-cv-00454-MMC

tsaenz@maldef.org
bescobosa@maldef.org

Tanya Gabrielle Pellegrini (Cal. Bar No. 285186)
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
1512 14th Street
Sacramento, CA 95814
Telephone: (916) 444-3031
tpellegrini@maldef.org

*admitted *pro hac vice*

*Attorneys for Plaintiffs and the Proposed Class*

MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT
CASE NO. 17-cv-00454-MMC